UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MM,

               Plaintiff,

     v.

SAN RAMON VALLEY UNIFIED SCHOOL DISTRICT,

               Defendant.

Case No. C-12-01337 JCS

**ORDER RE MOTIONS FOR SUMMARY JUDGMENT [Docket Nos. 19, 21]**

## I.   INTRODUCTION

Plaintiffs have brought an action asserting violations of the Individuals with Disabilities Act ("IDEA"), 42 U.S.C. §§ 1400, which was removed to this Court pursuant to 28 U.S.C. § 1441.   The parties have filed cross-motions for summary judgment ("the Motions") on the question of whether Defendant San Ramon Valley Unified School District ("School District") has denied Plaintiff MM ("Student") a free and appropriate public education ("FAPE").   A hearing on the Motions was held on Friday, December 21, 2012 at 9:30 a.m.   Subsequently, the parties filed supplemental briefs at the request of the Court.   For the reasons stated below, Plaintiffs' Motion is GRANTED.   Defendant's Motion is DENIED.

## II.   STATUTORY BACKGROUND

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A).   The IDEA defines "free and appropriate public education" as follows:

> The term "free appropriate public education" means special
> education and related services that--

United States District Court
Northern District of California

(A) have been provided at public expense, under public supervision and direction, and without charge;

(B) meet the standards of the State educational agency;

(C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and

(D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9).

The IDEA establishes a framework in which parents and schools engage in a cooperative process culminating in the creation of an individual education plan ("IEP") for every disabled student. 20 U.S.C. § 1414; *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005). "Each IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide." *Schaffer*, 546 U.S. at 53. The IEP must be "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 207 (1982). Schools are required to provide "a 'basic floor of opportunity' to disabled students, not a 'potential-maximizing education.'" *J.L. v. Mercer Island Sch. Dist.*, 575 F.3d 1025, 1033 (9th Cir. 2009) (quoting *Rowley*, 458 U.S. at 197 n. 21, 200). The IDEA also requires that the IEP allow the disabled student to receive an education in the "least restrictive environment" ("LRE"). 20 U.S.C. § 1412(a)(5).

## III.   FACTUAL AND PROCEDURAL BACKGROUND

Student is currently in the 7th grade at Arbor Bay School ("Arbor Bay"), a Non-Public School certified by the State of California to educate special education students. *See* Administrative Record of Proceedings Before the Office of Administrative Hearings, OAH Case No. 2011080735 ("AR") at 175. Student has attended Arbor Bay since she was in first grade, and since second grade her placement has been pursuant to an individual education plan ("IEP"). *Id.* At all relevant times, Student has been a resident of the School District. *Id.*

Student is eligible for special education as a child with speech and language impairment ("SLI"). *Id.* Her impairment includes severe childhood apraxia of speech, which is a motor speech disorder in which a child has difficulty saying sounds, syllables and words because the

2

United States District Court
Northern District of California

brain has problems planning to move the body parts (e.g., lips, jaw, tongue) needed for speech. *Id.* Student's apraxia has delayed her speech and impacted her academic performance. *Id.* She has difficulty sequencing sounds and articulating, and is sometimes unintelligible. TR 504-505. She also has trouble with language, including difficulties with verb tense and pronoun usage, composing and expressing her thoughts, and social language pragmatics. TR 505-507. Although she is sociable and creative in finding ways to communicate, she is sometimes frustrated because her peers do not understand her. AR 744, 747. She also has impairment of her fine and gross motor skills, including clumsiness arising out of spatial awareness issues. AR 825, 870.

At Arbor Bay, Student has received specialized and individualized instruction throughout the school day in a small classroom setting with a teacher-student ratio of no more than six to one, where the lead teacher is a credentialed special education teacher and the co-teacher has completed some coursework towards an associate of arts degree. TR 769, 865, 892. She receives speech and language therapy, assistive technology ("AT") services and the use of an Augmentative and Alternative Communication ("AAC") Device. TR 724, 726; AR 285.

On February 8, 2011, Student's parents, representatives of the School District and Arbor Bay staff participated in an IEP team meeting to review Student's IEP and make an IEP offer for the remainder of the 2010-2011 school and for the 2011-2012 school year. AR 228-229. The District offered Student continued placement at Arbor Bay for the remainder of the 2010-2011 school year. For the 2011-2012 school year, the District's IEP offer changed Student's placement to a district "Moderate" Special Day class ("SDC") with speech-language therapy services four times a week, including three individual sessions and one group session, for 30 minutes a session. AR 222; TR 145, 149. It also provided for "consultative" services in connection with use of assistive technology, namely, use of an adaptive augmentative communication device. AR 223, 228. Those services would be phased, with an initial phase of training and consultation of four hours a month, which would be reduced to two hours a month as School District staff developed skills to use Student's AAC device. AR 223, 228; TR 161-162; *see also* 285 (recommendation that Student transition from Vantage AAC device she had been using to something smaller). Student would also be "mainstreamed" for 20% of her school day, participating in general

3

education for "lunch, passing periods, PE, electives and other school day activities as appropriate." AR 221.

In an email dated May 27, 2011, Student's parents informed the School District that they were declining the IEP offer and that they consented to the program with the following exceptions:  1) they requested that Student remain at Arbor Bay for the 2011-2012 school year; 2) they rejected the provision of speech and language therapy of four thirty-minute sessions a week, citing testimony that Student needed speech and language therapy at least five times a week for thirty minute sessions: 3) they  rejected the provision of two hours a month of assistive services in connection with use of the AAC device and asserted their "stay-put" right to continue receiving two hours a week of such services.  AR 298.

In a letter dated June 11, 2011, the School District rejected the request of Student's parents to modify the IEP and formally offered to place Student at Charlotte Wood Middle School ("Charlotte Wood") with the program and services outlined in the February 8, 2011 IEP. AR 375-377.  Student's parents rejected the offer and the district petitioned to have the IEP implemented over the parents' objections.  AR 173-197.  A hearing was convened by the California Office of Administrative Hearings ("OAH") at which testimony and evidence was received.  *Id*.  The presiding administrative law judge ("ALJ") concluded, in a written decision issued on December 22, 2011, that the IEP offered by the School District provided a FAPE in the least restrictive environment and authorized the School District to implement the IEP without parental consent.  *Id*.

## IV.   CONTENTIONS OF THE PARTIES

### A.     Plaintiffs' Contentions

Plaintiffs contend that the ALJ erred in finding that the IEP offered Student a FAPE -- and erred in reaching the question of whether the program offered provided the least restrictive environment -- for three reasons: 1) in her SDC, Student is entitled to be taught by a teacher credentialed to teach students with a primary disability of SLI and the teacher of the SDC at Charlotte Wood does not hold such a credential; 2) Student is entitled to a classroom with a teacher-to-student ratio of no more than one teacher for six students and the SDC offered by the

4

United States District Court
Northern District of California

school district can have a teacher-to-student ratio of up to one teacher for 14 students;  3) Student requires at least one hour per week of AAC services taught by a speech-language pathologist and the School District has offered only two hours a month of assistive technology ("AT") services, not delivered by a Speech-Language Pathologist.  Plaintiff, MM, et al., Points and Authorities in Support of Motion for Summary Judgment ("Plaintiffs' Motion") at 7-8.  In addition, Plaintiffs contend that "mainstreaming" of Student at a large public middle school under the IEP denies her a FAPE because there is no evidence that Student would derive social benefit from "attending a middle school with typical middle school students as her communication and behavior is lagging too far behind the age group."  Plaintiffs' Motion at 21.

With respect to the credential held by the SDC teacher, Plaintiffs point to testimony by Kara Teach, the teacher of the moderate SDC in which Student was to be placed at Charlotte Wood, that she held a Moderate/Severe special education credential.  Plaintiffs' Motion at 12 (citing TR at  224).   According to Plaintiffs, this credential authorizes Ms. Teach to instruct only students with disabilities of "autism, moderate/severe mental retardation, deaf-blind, emotional disturbance, and multiple disabilities, to students in kindergarten, grades 1-12 through age 22." *Id*. (quoting Title 5, California Code of Regulations ("CCR") § 80048.6(b)(2)); *see also* Plaintiffs' MM, et al., Points & Authorities in Opposition of School District's Motion for Summary Judgment ("Plaintiffs' Opposition") at 12.  Plaintiffs argue that 5 CCR § 80048.6 "mandates specific authorizations for Education Specialist Instruction Credentials and Special Education Additional Authorization," including authorizations for a Language and Academic Development ("LAD") credential, and Student is entitled to a teacher who holds such a credential. Plaintiffs' Motion at 13-17 (citing 5 CCR § 80048.6(8)).

As to the teacher-to-student ratio, Plaintiffs cite testimony by the Director of Arbor Bay, Susan Rose, that all classrooms there have a teacher-student ratio of one to six, that Student benefits from that ratio, and that a ratio of one to twelve would not be beneficial.  Plaintiff's Opposition at 12 (citing TR 769, 792).  Plaintiffs contend (without providing a specific cite to the administrative record) that "[t]he district's offered classroom can accommodate up to 14 students with one teacher" and therefore, that the placement does not provide a FAPE.  *Id*.; *see also*

United States District Court
Northern District of California

Plaintiffs' Motion at 18.  According to Plaintiffs, "[t]he ALJ erroneously applied the standard of <u>adult</u>-to-student ratio and not the standard required for this student of a **teacher**-to-student ratio." Plaintiffs' Motion at 12 (emphasis in original).

Regarding the provision of AT services, Plaintiffs cite the testimony of the Arbor Bay speech language pathologist, Elizabeth Fletcher, that Student required one hour per week of AAC services delivered by a speech-language pathologist and that Ms. Fletcher and Student's other speech language pathologist at Arbor Bay, Kimberly McNutt, came to a consensus that Student needed one hour of AAC speech-language therapy a week.  Plaintiffs' Motion at 20 (citing TR 690-692); Plaintiffs' Opposition at 16 (citing TR 724).  In addition, Plaintiffs cite the testimony of Wendy Burkhart, the School District AT specialist who would provide AT services to Student under the IEP, that she is not a speech-language pathologist, that the services she would provide would not be speech-language therapy, and that the speech-language pathologists who have been working with Student at Arbor Bay are in a better position than she to understand Student's needs as to AAC services.  Plaintiffs' Opposition at 17 (citing TR 394).

Finally, with respect to whether Student would derive social benefit from mainstreaming, Plaintiffs point to testimony by Student's mother that attempts to include Student in activities with non-disabled peers, for example softball and girl scouts, were not successful because her peers ignored Student and would not socialize with her because of her difficulty communicating. Plaintiffs' Motion at 21-22.  In addition, Plaintiffs point to testimony by Kara Teach that the students in her SDC class at Charlotte Wood participate in a mainstream PE class, as well as testimony by Arbor Bay teachers and staff that Student would not benefit socially from a mainstream PE class.  *Id*. at 22.  Plaintiffs also cite testimony by Arbor Bay's Director, Susan Rose, that she would have safety concerns for Student in a mainstream PE class.  *Id*.

**B.     School District's Contentions[1]**

The School District rejects Plaintiffs' assertion that Student was not offered a FAPE, asserting that Plaintiffs' contentions are "simply not true," leading to the "dispiriting conclusion" that Plaintiffs' Motion was brought "for the purposes of obstruction and delay."[2]  Defendant San Ramon Valley Unified School District's Reply Memorandum of Points and Authorities in Support of Motion for Summary Judgment ("Defendant's Reply") at 2.

With respect to Plaintiffs' argument that Student's rights have been denied because the SDC teacher at Charlotte Woods, Kara Teach, does not have a LAD credential, the School District contends that this argument fails for several reasons.  First, the School District asserts that because Ms. Teach has a moderate to severe credential, she is authorized under CCR § 80048.6(b)(2) to instruct students with "multiple disabilities;" because Student has apraxia, motor limitations and intellectual disabilities, the School District contends, she is classified as having "multiple disabilities" and therefore, Ms. Teach is qualified to instruct her.  Defendant San Ramon Valley Unified School District's Motion for Summary Judgment ("Defendant's Motion") at 18-19.  Second, the School District argues that the IEP was appropriate because at the time it was developed, there was no LAD credential.  *Id*. at 19.  Because the adequacy of the IEP is judged under the "snapshot rule," the School District asserts, the fact that it did not require that the SDC teacher have such a credential was reasonable.  Defendant's Reply at 4 (citing *Adams v.*

---

[1] In its summary judgment motion, the School District argues that the IEP is appropriate because it offers the least restrictive environment (LRE).  The question of whether the IEP complies with this requirement was disputed in the administrative proceeding.  *See* TR 105.  In this action, however, Plaintiffs have taken the position that "the crux of the dispute is **NOT** whether the district's offer is the least restrictive environment because under proper legal analysis, one does not reach that question until the actual offer of classroom placement and related services are determined to be appropriate for the the student."  Plaintiffs' Opposition at 2 (emphasis in original).  As Plaintiffs do not challenge the IEP on this basis, the Court need not address this issue.

[2] The School District's suggestion that Plaintiffs have acted in bad faith is not well taken.  There is no evidence in the record that Plaintiffs' arguments are anything other than an attempt to vindicate Student's right under the IDEA to a free and appropriate education, which they believe, in good faith, has been denied. Accordingly, the School District's request for an award of attorneys' fees under 20 U.S.C. § 1415(i)(3)(B)(i)(III),  which permits an award of fees against parents who bring an action for an improper purpose, is DENIED. S*ee* Defendant's Reply at 8.

United States District Court
Northern District of California

*State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999)).[3] Third, the School District contends that

the IEP was adequate because a special education student can receive a FAPE even if the primary

instructor is not credentialed with respect to the student's specific disability.  Defendant's Motion

at 19-20 (citing *Sacramento City Unified Sch. Dist. v. Rachel  H*., 14 F.3d 1398 (9th Cir. 1994);

*Hartmann v. Loudoun County Bd. of Educ.*, 118 F.3d 996 (4th Cir. 1997)).  Defendant points out

that the teachers who provided speech and language instruction to Student at Arbor Bay, like the

SDC teacher at Charlotte Wood, also did not hold a LAD credential.  Defendant San Ramon

Valley Unified School District's Memorandum of Points and Authorities in Opposition to

Plaintiffs' Motion for Summary Judgment ("Defendant's Opposition") at 12.

      In response to Plaintiffs' assertion that the student-to-teacher ratio at Charlotte Wood is

too high, the School District points to testimony by the director of secondary special education for

the School District, Karen Heilbronner, that the student to teacher ratio is maintained at three to

one in the moderate special day class at Charlotte Wood.  Defendant's Reply at 5 (citing TR 933

Defendants also cite testimony).  Defendants also cite testimony by Francis English, a School

District program supervisor for special education that the "class, by contract, can go up to 16

---

[3] The School District has filed a request for judicial notice ("RJN") in which it has submitted the following materials relating to the LAD credential:  1) California Code of Regulations, Division VII of Title 5, Notice of Proposed Rule Making (hereinafter, "Notice"); and 2) Commission on Teacher Credentialing, Education Specialist Teaching Credential:  "Language and Academic Development (LAD): Frequently Asked Questions, Glossary and Charts," dated September 15, 2011 (hereinafter, "FAQs").  Plaintiffs have not objected to this request, which is GRANTED.

      The Notice reflects that a public hearing on the proposed regulation establishing an LAD credential was set for June 2, 2011 and explains the reasons for the proposal.  RJN, Ex. A.  The FAQs also explain the reasons for establishing the LAD credential and compares the already existing Speech-Language Pathology ("SLP") Services Credential with the LAD credential, explaining that the SLP credential "authorizes a speech pathologist to provide services to students with language and/or speech disorders" while the LAD credential "authorizes individuals to teach students with communication and academic language deficiencies."  *Id*. at 1.  The primary difference between the SLP and LAD credentials is that "the LAD authorizes the holder to provide instructional services within content areas and the SLP Services Credential authorizes the holder to provide services to students identified with speech and/or language disorders.  Both . . . address language needs of students; one in an instructional setting and the other in a service capacity."  *Id*. at 2.  The FAQs further explain that it is the IEP team that decides what credential must be held by the individuals who work with the student and that the team may decide that a student should receive both SLP services and LAD instruction or only LAD instruction.  RJN, Ex. B at 3, 6.

students" but that the School District "tr[ied] to keep it no more than 14" and that at the time of the IEP meeting the class had less than 14 students.  Defendant's Opposition at 15 (citing TR 406-407).  The School District further points to testimony that the student to teacher ratio at Arbor Bay was six to one at the time of the hearing.  *Id*. (citing TR 865, 892).  The School District rejects Plaintiffs' distinction between teachers and adults in determining the teacher to student ratio and notes that in any event, the "co-teachers" at Arbor Bay are not credentialed teachers and are only required to have completed course work towards an Associate of Arts ("AA") degree.  Defendant's Reply at 5-6.  In contrast, Defendant asserts, the testimony showed that the paraprofessional who worked with Kara Teach in the Charlotte Wood SDC held a mild/moderate credential.  *Id*. at 6.

The School District also rejects Plaintiffs' assertion that the IEP is inadequate because it provides for only two hours a month of AAC services and does not require that those services be provided by a speech-language pathologist.  Defendant's Reply at 6-7.   The School District argues that the AT services offered in the IEP are sufficient because one of Student's two speech and language therapists at Arbor Bay, Karen McNutt, testified that she herself was not an AAC specialist, that individuals other than a speech pathologist could teach student how to operate and take care of the AAC device, and that if Student were receiving 120 minutes a week of speech therapy but no AAC services from a speech and language pathologist she could "make progress" on her speech goals.  Defendant's Reply at 7 (citing TR 638-641).  Defendants also cite testimony by School District AT specialist Wendy Burkhardt "that there was agreement by the [IEP] team that AAC goals were not necessary."  Defendant's Opposition at 16 (citing AR 257, TR 366-367).  Defendant cites, in particular, notes from the February 8, 2011 IEP meeting stating that "the goal of using her voice output device has been met at the time it was targeted, but the team is no longer working on this goal."  *Id*. (citing AR 228).  Defendant also points to evidence that Student had "not been using her device with any regularity" in the period leading up to the February 8, 2011 IEP meeting."  Defendant's Motion at 21;  *see also* Defendant's Opposition at 10 (citing AR 228, TR 693).

United States District Court
Northern District of California

The School District disagrees with Plaintiffs on the question of mainstreaming, contending that the evidence in the record shows that the mainstreaming in the IEP is appropriate. Defendant's Opposition at 17-20.  The School District cites testimony by Francis English that Student has demonstrated social ability and a desire to interact with peers and that "that opportunity wasn't available to her at Arbor Bay." *Id*. at 18 (citing TR 410, 458).  The School District further points to testimony by Ms. English that if a student needs adult support, for example, to "go out on the playground, to interact with typically developing peers . . . we look at that pretty carefully to make sure whatever class they're placed in, they're able to have peers, make friends, learn to socialize in different contexts." *Id*. at 18 (quoting TR 410).  The School District  also points to Ms. English's testimony that she had observed Student at Arbor Bay and spoken to her classroom teacher and had concluded that Student would enjoy and benefit from interaction with general education students." *Id*. at 19 (citing TR 458-459).   In addition, the School District points to testimony by a School District program supervisor that the District's mainstreaming proposal "matched the specific goal in the IEP to have [Student] 'independently ask a peer or adult a question.'" *Id*. at 18 (citing TR 208-210).

Testimony by Arbor Bay teachers is also cited by the School District, including testimony by her classroom teacher, Karen Herndon, that Student is "very creative in terms of communicating to get her peers to understand her" and testimony by Arbor Bay Director Susan Rose that Student enjoys recess, likes to do sports and games that are offered with assistance, likes to be part of a group, is talkative with her friends at Arbor Bay and is on the Arbor Bay student council.  *Id*. at 19 (citing TR 744, 860-863).

Finally, the School District asserts the testimony by Student's mother that Student's attempts to engage with non-disabled peers in softball and Girl Scouts were not successful is not relevant because "[t]here is no basis for concluding that the difficulties [Student] may have faced elsewhere would recur at Charlotte Wood, where the moderate SDC provided flexible support to students to allow them to make friends and to socialize with their peers in different contexts." *Id*. at 19 (citing TR 410).

United States District Court
Northern District of California

# V.   ANALYSIS

## A.   Standard of Review

Summary Judgment is appropriate when there is no genuine issue as to material facts and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56.   However, because a summary judgment motion in a case challenging a decision by a state educational agency is "in substance an appeal from an administrative decision," it will not "fit well into any pigeonhole of the Federal Rules of Civil Procedure." *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891-92 (9th Cir.1995).

The IDEA requires state and local educational agencies to establish certain administrative procedures "to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies." 20 U.S.C. § 1415(a).  Once that administrative process has been exhausted, the final decision may be challenged in federal district court.  20 U.S.C. § 1415(i)(2).   The IDEA further provides that on appeal, "the court – (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).   "Thus, judicial review in IDEA cases differs substantially from judicial review of other agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review." *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1471 (9th Cir. 1993).   On the other hand, the preponderance of the evidence standard "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Capistrano*, 59 at 891 (internal quotation marks omitted) (quoting *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982)).   Rather, the district court's obligation to receive the administrative record "carries with it the implied requirement that due weight shall be given to these proceedings." *Rowley*, 458 U.S. at 206.

The Ninth Circuit has explained that under the "due weight" standard, district courts retain discretion in deciding how much deference should be afforded the decision of the state

11

United States District Court
Northern District of California

1  educational agency in a particular case. *See Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307,

2  1311 (9th Cir.1987).  Where the administrative findings are "thorough and careful," greater

3  deference is appropriate.  *See Capistrano*, 59 F.3d at 891 (*quoting Union Sch. Dist. v. Smith*, 15

4  F.3d 1519, 1524 (9th Cir. 1994)).

5        In *Ojai Unified Sch. Dist. v. Jackson*, the Ninth Circuit addressed the provision allowing

6  the court to hear "additional evidence at the request of the party."  4 F.3d 1467, 1471 (9th Cir.

7  1993) (citing 20 U.S.C. § 1415(i)(2)(C)).  It found that the word "additional" carries its ordinary

8  meaning and therefore, that this provision refers to "supplemental evidence."  *Id.*  Thus, it does

9  not permit witnesses to repeat or embellish testimony offered at the administrative hearing.  *Id.*

10  The *Ojai* court explained that the determination of what constitutes "additional evidence is left to

11  the discretion of the trial court" and that:

12            The reasons for supplementation will vary; they might include gaps
            in the administrative transcript owing to mechanical failure,
13            unavailability of a witness, an improper exclusion of evidence by
            the administrative agency, and evidence concerning relevant events
14            occurring subsequent to the administrative hearing. The starting
            point for determining what additional evidence should be received,
15            however, is the record of the administrative proceeding.

16

17  *Id.* at 1473.  It cautioned that "the trial court which must be careful not to allow such evidence to

18  change the character of the hearing from one of review to a trial de novo."  *Id.*

19        The party challenging a prior administrative ruling bears the burden of persuasion. *See*

20  *Clyde K. v. Puyallup Sch. Dist. No. 3*, 35 F.3d 1396, 1399 (9th Cir. 1994).

21      **B.**    **Credential of SDC Teacher**

22        There is no dispute between the parties that the teacher who would have instructed Student

23  in the moderate SDC at Charlotte Wood, Kara Teach, held a Moderate/Severe special education

24  credential but not an LAD credential.  At oral argument, Plaintiffs conceded that the LAD

25  credential was not available at the time of the IEP meeting on February 8, 2011 and therefore,

26  Student's IEP could not have required that the special day class be taught by a teacher who holds

27  such a credential.   Plaintiffs argue, nonetheless, that the placement offered by the School District

28  denies student a FAPE because Student's primary disability is speech and language impairment

12

and the credential held by Ms. Teach does not authorize her to teach a student whose primary disability is speech and language impairment.  Plaintiffs reject the School District's contention that Ms. Teach is authorized to instruct Student on the basis that her Moderate/Severe credential authorizes her to teach children with "multiple disabilities," arguing that there has been no determination that Student is eligible for special education on the basis of multiple disabilities and there is no evidence that she would qualify as a student with multiple disabilities.  The School District counters that the IDEA does not impose specific credential requirements, citing the *Hartmann* and *Rachel H* decisions.  It further contends that even if it did, state credentialing requirements are met because Student's IEP lists "intellectual disability" as a secondary disability and Plaintiffs did not challenge this secondary disability during the administrative process.  Finally, the School District points to evidence that Student has an orthopedic impairment, contending this evidence also qualifies Student as having multiple disabilities.   For the reasons stated below, the Court finds that the credential held by Ms. Teach does not result in a denial of a FAPE.

**1.  Whether the IDEA Requires Special Education Teacher to Hold Credentials Specific to Student's Disability**

The School District argues strenuously that it is not required under the IDEA to ensure that Student's special day class teacher hold any specific credential, citing *Rachel H.* and *Hartmann*. The Court finds that the School District's position is incorrect to the extent it suggests that the IDEA does not require it to meet California's standards regarding the credentialing of special education teachers.

First, the *Hartmann* decision is not on point.  It is true that the Fourth Circuit in that case, citing the Supreme Court's decision in *Rowley,* noted that the IDEA "does not require special education service providers to have every conceivable credential relevant to every child's disability."  118 F.3d 996, 1004 (4th Cir. 1997) (citing *Board of Education of Hendrick Hudson Central School Dist. v. Rowley*, 458 U.S. 176, 199 (1982)).  In that case, however, the court found that a special education teacher was qualified to teach a student with autism where there *was no* state certification for teaching children with autism.  *Id.*  Thus, the court's holding in *Hartmann*

does not stand for the broad proposition that the IDEA does not require that school districts comply with state requirements governing the credentials required to teach students with disabilities, as the School District suggests. Indeed, such a holding would directly contradict the express requirement under the IDEA that a FAPE must comply with "the standards of the State educational agency." *See* 20 U.S.C. § 1401(9).

Similarly, the Court rejects the School District's broad reading of the *Rachel H.* case. In that case, the Ninth Circuit rejected the school district's assertion that under state law a student *had* to be taught by a credentialed special education teacher and therefore could not be taught full-time in a regular classroom. 14 F.3d 1398, 1399, 1404-1405 (9th Cir. 1994). The Ninth Circuit explained that the school district's position was inconsistent with 20 U.S.C. § 1412(5)(B), which expresses "Congress's preference for educating children with disabilities in regular classrooms with their peers" *Id.* at 1403. However, the court "[d]id not reach a decision on [the school district's] broad assertion." *Id.* at 1405. The dispute in this case, in contrast to *Rachel H.*, does not turn on whether mainstreaming is appropriate. Nor does the reasoning or holding of *Rachel H.* suggest that where an IEP team has found that mainstreaming is *not* appropriate, that is, that a student should receive instruction in a special classroom rather than a regular classroom, the credentialing requirements under state law do not apply to the teacher of the special day class. Because it is undisputed that Student should receive the majority of her instruction in a special day class rather than a regular classroom, the holding in *Rachel H.* simply does not apply here. Thus, neither *Rachel H.* nor the *Hartmann* decision resolves the question of whether the credential held by Ms. Teach satisfies the requirements of the IDEA as to Student, which the Court addresses below.

### 2. Whether the Credential of Ms. Teach is Adequate to Provide Student a FAPE

#### a. Issues Related to Administrative Proceeding

Before the Court reaches the substantive question of whether Ms. Teach's credential is adequate to provide Student with a FAPE, it must review the administrative record to determine

1) whether any waiver has occurred on issues related to the credential question; and 2) the weight that should be given to the conclusions of the administrative law judge on this issue,

At the administrative level, Plaintiffs identified four issues to be addressed in the administrative proceeding; one of these was the question of whether the School District had denied Student a FAPE by "[f]ailing to offer classroom teacher that holds the appropriate credential to teach a student with a primary disability of Speech-Language Impairment." AR 00070 (Student's Amended Prehearing Conference Statement). In Plaintiffs' closing brief, they again raised this issue, arguing that Ms. Teach did not have a credential that authorized her to teach a student with a primary disability of speech-language impairment. AR 00165 (Student's Closing Brief). The School District did not address this issue in its own closing brief, only referring in passing to Ms. Teach as a "credentialed special education teacher." AR 00147. It did not argue that Ms. Teach's Moderate/Severe credential was adequate because Student had multiple disabilities. Nor did it ever refer to Student as being eligible under the disability category of multiple disabilities, stating instead only the "Student's primary disability category is Speech and Language Impaired." AR 00136.

Further, in his decision the ALJ did not include Plaintiffs' credential argument in his summary of the parties' contentions. *See* AR 00174. Nor did he address the argument in any meaningful way, though he stated in passing that Ms. Teach holds a Moderate/Severe teaching credential and that she is "qualified to [instruct] students with SLI."[4] There is no evidence in the record that Ms. Teach holds anything other than the Moderate/Severe credential, which does not list speech and language impairment as one of the disabilities covered by that credential; thus, the basis for the ALJ's conclusion that Ms. Teach was qualified to instruct "children with SLI" is unclear.[5] Because the ALJ has not offered a clear and thorough analysis on this question, the Court finds that his implicit rejection of Plaintiffs' argument is entitled to no deference.

---

[4] In the original decision, the ALJ wrote, "Both Ms. Herndon and Ms. Teach are qualified to students with SLI." AR 00178. The Court has supplied the missing word.

[5] The Court notes that at the time of the February 2011 IEP, there was a specific regulation governing the credentials that authorized a special education teacher to instruct a student with Speech and Language Impairment. This regulation provided as follows:

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The Court also declines to find waiver and/or failure to exhaust administrative remedies as

2   to either party.  In their supplemental briefs, both parties argued that the other side should have

3   raised issues relevant to the credential question in the administrative proceeding and therefore

4   should be precluded from raising them in this Court:  the School District argues that Plaintiffs

5   should have challenged the secondary disability of intellectual disability in Student's February

6   2011 IEP while  Plaintiffs contend the School District has always cited to speech and language

7   impairment as Student's disability category and therefore should not be permitted to argue in this

8   Court that Student is eligible for special education under the multiple disabilities category.  Given

9   that Plaintiffs consistently argued that Ms. Teach's credential did not authorize her to instruct a

10   student whose primary disability is speech and language impairment, the Court finds that

11   Plaintiffs have adequately exhausted their administrative remedies on this issue.  The Court notes

12   that as the School District did not argue in the administrative proceeding that the credential was

13   adequate because Student had multiple disabilities, Plaintiffs' failure to raise in the administrative

14   proceeding the question of whether Student should be categorized as a student with multiple

15   disabilities does not give rise to any waiver or failure to exhaust.

16    On the other hand, the Court also does not find any waiver on the part of the School

17   District.  While it is true that throughout the administrative proceeding the School District, the

---

18   Holders of the listed credentials are authorized to teach students with
19   disabilities in which the primary disability is "speech or language
     impairment" as defined in subsection 300.8(c)(11) of Title 34 Code of
20   Federal Regulations, Subpart A.

21

22   (a) Special Education Specialist Instruction Credential for the Communication
     Handicapped
23   (b) Clinical or Rehabilitative Services Credential in Language, Speech and Hearing
     with the Special Class Authorization
24   (c) Standard Teaching Credential with the Minor-Speech and Hearing
     Handicapped
25   (d) Restricted Special Education Credential-Speech and Hearing Therapy
26   (e) Limited Specialized Preparation Credential-Speech and Hearing Handicapped
     (f) Special Secondary Credential-Correction of Speech Defects
27   (g) Exceptional Children Credential-Speech Correction and Lip Reading

28   5 CCR § 80047.5 (2010).   There is no evidence in the record that Ms. Teach possessed any of the
     credentials listed in this regulation.

16

1  parties and the ALJ all characterized Student as being disabled under the category of speech and

2  language impairment, the February 2011 IEP listed intellectual disability as a secondary disability

3  and the record indicates that Student's parents agreed with that finding.  *See* AR 254 (IEP meeting

4  notes stating that parents accepted Secondary Disability of "Mental Retardation" in previous

5  IEP); AR 298 (stating that parents consented to February 2011 IEP with certain exceptions that

6  do not include secondary disability).  Thus, at least to the extent the School District's position is

7  based on the secondary disability listed in Students February 2011 IEP as a basis for its argument,

8  the Court concludes that a finding of waiver is not appropriate.

9          **b.**    **Credential Requirements under the IDEA and California Regulations**

10        Under the IDEA, a FAPE requires that special education and related services "meet the

11  standards of the State educational agency."  20 U.S.C. § 1401(9).  Thus, in a case involving a

12  California student, the Ninth Circuit held that "special education teachers must possess credentials

13  specific to a child's primary disability," citing California regulations governing the credentialing

14  of special education teachers.  *Weissburg v. Lancaster School District*, 591 F.3d 1255, 1259 (9th

15  Cir. 2010) (citing 5 CCR § 80046.5 ("Credential holders who are authorized to serve children

16  with disabilities must possess a credential that authorizes teaching the primary disability of the

17  pupils").  The Moderate/Severe credential held by Ms. Teach authorizes her to instruct

18  "individuals with a primary disability of autism, moderate/severe mental retardation, deaf-blind,

19  emotional disturbance, and multiple disabilities."  5  CCR § 80048.6(b)(2).

20        The School District contends the Moderate/Severe credential authorizes Ms. Teach to

21  instruct Student because Student has "multiple disabilities."  In particular, it asserts that Student

22  has multiple disabilities because in addition to Student's speech and language impairment: 1) her

23  IEP lists "intellectual disability" as a secondary disability; and 2)  there is evidence in the record

24  that Student has "gross and fine motor skill impairments." *See* Docket No. 32 (Defendant's

25  Supplemental Brief) at 7.    Plaintiffs, on the other hand, argue that § 80046.5 requires that

26  Student's special day class teacher hold a credential as to her primary disability, that is, speech

27  and language impairment, and further, that there is no evidence that Student has multiple

28  disabilities.  The parties have not cited any case authority that offers guidance as to whether a

United States District Court
Northern District of California

17

United States District Court
Northern District of California

student with a primary disability that is not specifically listed in § 80046.5 may be taught by a

teacher with a Moderate/Severe credential on the basis of multiple disabilities or what kind of

showing is necessary to establish "multiple disabilities."  Nor has the Court found any cases that

address this question.  Accordingly, the Court looks to the federal and state regulations for

guidance.

The parties agree that "multiple disabilities" is not defined in the California regulations

and therefore, that the applicable definition is found in the federal regulations, which define the

term as follows:

> Multiple disabilities means concomitant impairments (such as
> mental retardation-blindness or mental retardation-orthopedic
> impairment), the combination of which causes such severe
> educational needs that they cannot be accommodated in special
> education programs solely for one of the impairments. Multiple
> disabilities does not include deaf-blindness.

34 C.F.R. § 300.8(7).   The regulation does not expressly state that each of the impairments, on its

own, must constitute a disability that would entitle a child to special education in order for a child

to be found to have "multiple disabilities," although the Court finds this to be a reasonable

reading of the regulation.  The Court need not decide this question, however, because it finds, for

reasons discussed below, that Student has multiple disabilities on the basis of her secondary

disability of "intellectual disability," which standing on its own, constitutes a disability that

entitles a child to special education.  *See*  20 U.S.C. § 1401(3)(A)(i).

Plaintiffs suggest that because Student's primary disability is speech and language

impairment -- and because the School District has never cited the multiple disabilities category as

a basis for Student's eligibility for special education -- the credential held by her special day

teacher must be based on her primary disability.  Plaintiffs have cited no authority, however,

indicating that a student with a primary and a secondary disability may not be considered to have

"multiple disabilities" for the purposes of the credential requirements simply because the school

district has not used the term "multiple disability" to describe the student's disability category.

Further, a common sense reading of the definition of multiple disabilities suggests a contrary

conclusion, that is, that a child who has been found to have a primary disability and a secondary

disability has "multiple disabilities."  This conclusion finds support in the federal regulation governing the reporting of the number of children receiving special education by the states, 34 C.F.R. § 300.641.  That regulation requires that states must report a child under only one disability category and that "[a] child who has more than one disability and is not reported having deaf-blindness or as having a developmental delay must be reported under the category "multiple disabilities." *Id.*  Under this regulation, Student would be reported as having "multiple disabilities" under the February 2011 IEP.  The Court sees no reason why this designation would not also indicate that a teacher with a Moderate/Severe credential is authorized to instruct Student in a special day class.

Finally, while there is not extensive evidence in the record on the question of  whether Student has an intellectual disability, there is sufficient evidence from which the Court concludes that the intellectual disability finding is supported by a preponderance of the evidence.  In particular, it is undisputed that testing of Student showed that Student's IQ scores range from the 60s to the 90s.  *See* AR 00254.  On the basis of this evidence, Student's mother stated in 2010 that she accepted the secondary eligibility for special education based on intellectual disability.  *Id.* While Plaintiffs' counsel states in their supplemental brief that the IQ results for language-delayed individuals are unreliable and should not be relied upon in this case, no evidence on this point is cited;  rather, Plaintiffs rely entirely on attorney argument.  Nor have Plaintiffs identified any witnesses whose testimony would support their position that Student does not have an intellectual disability.  In short, the preponderance of the evidence supports the finding that Student has an intellectual disability and therefore has multiple disabilities for the purposes of California's Moderate/Severe credential.  Accordingly, the Court rejects Plaintiffs' assertion that Student has been denied a FAPE on the basis of the credential held by the SDC teacher at Charlotte Wood.[6]

---

[6] Because the Court finds that Student has multiple disabilities based on her speech and language impairment and her intellectual disability, it need not reach the question of whether her motor skills impairment would also support a finding that she has multiple disabilities, even assuming that argument was not waived by the School District.

United States District Court
Northern District of California

United States District Court
Northern District of California

### C.    Student-to-Teacher Ratio

Plaintiffs contend that Student's right to a FAPE is not met by the IEP because the SDC at Charlotte Wood can accommodate up to 14 students (a fact that is undisputed) and Student requires a ratio of no more than 6 students for every teacher.  This position, however, depends on the assumption that the adults that assist the instructor in the SDC class should not be considered because they are not required to hold special education credentials.  (In fact, Kara Teach testified that at the time of the hearing, one of the two assistants held a mild to moderate teaching credential.  AR 228-229.)   This assumption is not supported by the evidence in the record, however, given that the co-teachers at Arbor Bay that ensure the six to one ratio also are not required to hold a special education credential.  As Plaintiffs do not dispute that the student-to-adult ratio at Arbor Bay is appropriate to meet Student's needs, their assertion that the ratio at Charlotte Wood is inappropriate is not persuasive.[7]

### D.    AAC Services[8]

Plaintiffs contend that the AT services in the February 8, 2011 IEP are inadequate to provide Student with a FAPE because she requires at least an hour a week of AAC services and

---

[7] The Court's conclusion is consistent with the findings of the ALJ.  *See* AR 177-178, OAH Decision, Finding No. 15 ("At [Arbor Bay], Student received educational benefits from a ratio of up to 1:6.  The evidence established that Student would continue to receive educational benefits with similar ratio, even with a ratio as high as 1:7.  Student's middle school program at [Arbor Bay] is a multi-grades classroom, serving students between sixth and eight [sic] grades.  It has 12 students and two co-teachers, an adult-to-student ratio of 1:6. At [School] District's moderate SDC at Charlotte Wood, the adult-to-student ratio during the SY 2011-2012 is not more than 1:3, as the classroom has one credentialed teacher and two paraeducators who assist with small groups and individual academic and social instruction of nine students.");  *see also id*. at  179, OAH Decision, Finding No. 19 ("Regarding the qualifications of [School] District's SDC paraeducators, especially when compared to the qualifications of [Arbor Bay's] classroom aides, often referred to as 'co-teachers,' the evidence fails to establish any significant difference in the hiring requirements.  Based on the evidence, in order to be hired as either a [School] District paraeducator or [an Arbor Bay] co-teacher, the applicant is only required to have received a high school diploma.").

[8] Plaintiffs draw a distinction between AT services and AAC services.  However, the only assistive technology at issue in this case is Student's AAC device.  Hence, the ALJ refers to these services as "AT/AAC Services."  The Court also finds no meaningful difference between these two types of services under the facts of this case.

United States District Court
Northern District of California

these services should be provided by a speech language pathologist.  While this issue presents a close call, the Court concludes that the IEP does not offer a FAPE in this respect.

The ALJ rejected Plaintiffs' position in his written decision.   See AR 185-188, OAH Decision, Finding Nos. 44-57.  Therefore the Court begins its analysis by looking to the reasoning offered by the ALJ to support his conclusion.  The ALJ considered the testimony of:  1) Ms. Fletcher, who is a speech-language pathologist at Arbor Bay and provides Student's AAC services; 2) Kimberly McNutt, a speech-language pathologist at Arbor Bay who works with Student but does not provide instruction using the AAC device;  3) School District AT specialist Nancy Burkhart, who is a certified AT specialist but is not a speech and language pathologist;  4) Linda Spencer, a School District special education supervisor.

Although Ms. Fletcher and Ms. McNutt had worked with Student at Arbor Bay and agreed that Student requires an hour a week of direct AAC services, provided by a speech-language pathologist, the ALJ discounted their testimony, finding that other than the fact that Student had received such services in the past and benefited from them, Ms. Fletcher's recommendation was "not based on any demonstrated needs of the Student."  AR 186-187.  The ALJ reasoned that the evidence fails to establish what the "direct AT/AAC services [recommended by Ms. Fletcher and Ms. McNutt] would accomplish."  AR 186.  He explained:

> According to the testimony of Student's [Arbor Bay] AAC specialist, Ms. Fletcher, working with Student, the job of the AAC specialist would have been to upload necessary programs/software, program required icons, and input appropriate speech models into the device in order for Student to be able to use the device for instruction/speech repair (teaching correct sounds and pronunciation of words, among others), in therapy, or the classroom for her language and communication needs, as necessary. Therefore, any trained staff, including Student's teacher and SL therapist would be able to use Student's device to aid her access to classroom instruction/ curriculum.

AR 186.  In support of this conclusion, the ALJ also pointed to Ms. McNutt's testimony that Student could receive "educational benefit from the AT/AAC services offered by the District, even when such services are consultative rather than direct" and that "other staff, rather than a

speech pathologist, can work on student's device and may be trained to assist with programming, navigation, uploading icons, building vocabularies, and so on." AR 187.

The ALJ also placed significant weight on the testimony of Ms. Spencer and Ms. Burkhart, who he found "testified corroboratively and persuasively that the District's offer of AT/AAC services of two times was both appropriate and adequate." AR 187. In particular, he relied on their testimony that "[b]ecause Student's IEP does not contain AT/AAC goals, both agree that it would have been inappropriate to pull-out Student from required or important classroom instructions in order for her to receive such direct AT/AAC services." *Id*. He also cited testimony that "[b]oth explained that such direct AT/AAC services would have been unnecessary and improper for Student." *Id*. The ALJ concluded that because Student's IEP already provided her with adequate access to speech-language therapy, the evidence did not establish that Student required additional speech-language therapy in connection with the receipt of AAC services, or that the two hours a month allowed (after a four-week transition period during which Student and her providers would receive training on a the AAC device) was insufficient. AR 187-188.

Turning to the evidence in the record, the Court first reviews the testimony of the individuals at Arbor Bay who provide Student with speech and language therapy. The Court does not agree with the ALJ that Ms. Fletcher and Ms. McNutt have not provided a good basis for their opinion that Student needs, in addition to her regular speech language therapy, an hour a week of speech language therapy involving use of her AAC device, to be provided by a speech and language therapist. Both Ms. Fletcher and Ms. McNutt testified that Student's AAC device is used to assist Student with development of her language. In particular, Ms. Fletcher testified that Student needs the AAC device *not only* for communication repair but also for "learning proper grammar structure and sentence construction." TR 696. Similarly, Ms. McNutt testified that the AAC specialist not only teaches Student to operate and take care of the device (which admittedly can be done by individuals who are not trained as speech and language pathologists) but also to "build her language and her receptive vocabulary because of the vocabulary in the device." TR

638. This evidence provides strong support for the conclusion that Student requires the services recommended by Ms. Fletcher and Ms. McNutt.

Further, the absence of an explicit goal in the IEP targeting use of the AAC device does not support the ALJ's conclusion that the recommended AAC services need not be provided. When questioned about which IEP goals targeted use of the AAC device, Ms. Fletcher offered the following testimony:

> So our intention as a team was that the language goals we were targeting would be targeted both using her device and using traditional speech therapy methods.  We wrote the goals together to make a more cohesive document and a more holistic approach to her therapy. …[So in IEP Goal Three, entitled "verb tense"] [o]ur intention was that we would use this device in therapy, and that would transition to functional verb tense use in her speech.

AR 220. When further questioned as to why the IEP did not indicate that it required an AAC specialist, Ms. Fletcher responded that the team "didn't think it was necessary to indicate that in the goal" because the team "agreed on how the goal would be targeted, but . . .[didn't consider it] might need to document that for the record how we were going to do it."  TR 698.  Ms. Fletcher's testimony is corroborated by the IEP meeting notes, which state that "[Ms. Fletcher's] AAC goals are embedded in the speech and language goals at this time."  AR 228.

The School District finds Plaintiffs' objection to the IEP "most curious since the District in fact proposed an hour a week of AAC services."  Defendant's Opposition at 16.  There is nothing "curious" about Plaintiffs' objection on this point and Defendant's argument is frivolous. It is crystal clear in the IEP that Student was to receive an hour a week of assistive services only for a four-week transition period; after another month in which she would receive three hours of assistive services, she would receive only two hours a month of AAC services going forward.  *See* AR 207, 223.

The School District also implies that Plaintiffs' objections are "hard to understand" because "enhanced AAC services were not even identified as a goal" and Student "rarely used her old device in class in the time period before the 2011 IEP.  *Id*. at 16.  Again, the School District mischaracterizes the record.  In addition to the fact that the IEP team understood that the goals

related to use of the AAC device were "embedded" in Student's speech and language goals (as discussed above), the record is also clear that Student had stopped using her AAC device because the particular device that was provided to Student no longer met her needs.  *See* TR 695, 699-700. Indeed, the IEP notes indicate that the IEP team agreed that Student needed a new AAC device that was more appropriate for her needs. AR 228.

The School District's suggestion that the IEP team agreed that AAC goals were no longer necessary because a goal from Student's previous IEP related to use of the AAC device is similarly misleading.  *See* Defendant's Opposition at 16.  As discussed above, it is clear from the record that while the IEP does not include goals that specifically reference the use of an AAC device, it was understood that some of the speech and language goals were to be met, in part, through the use of such a  device.   For example, it was understood that Goal Three, targeting verb tense, was to be achieved through use of an AAC device. The fact that the IEP noted that Student was no longer working on a goal in her prior IEP targeting use of the AAC device for primary communication, *see* AR 228, does not support the conclusion that there were *no* AAC goals, express or implied, in the February 8, 2011 IEP.

Accordingly, the Court concludes, based on the preponderance of the evidence, that a FAPE requires that Student be provided the AAC services that were recommended by the speech and language therapists who have worked with Student at Arbor Bay.

### E.    Mainstreaming

Plaintiffs contend that the mainstreaming in the IEP does not provide Student with any social benefit and therefore, Student should be placed at Arbor Bay.  The Court agrees.

Again, the Court begins its analysis by considering the reasoning offered by the ALJ, who reached a contrary conclusion on this question.  The ALJ explained that the mainstreaming provided for under the IEP was appropriate for the following reasons:

> Regarding non-academic benefit of the SDC placement to Student, Student enjoys group and whole class activities more than independent activities, she is a wonderful team player and skilled at being a leader or playing supporting roles.  She enjoys hands-on learning (cooking, experiment, and art), is energetic and is a curious person who loves to learn.  She has a wonderful sense of humor and is kind to others.  She is also quite social and is someone that "enjoy

United States District Court
Northern District of California

[sic] people." Therefore, District's offer would provide Student greater opportunity for mainstreaming and allow her social access to typically-developing peers. Student demonstrated interest, motivation and strength in this area and the totality of the evidence suggests that she would benefit from opportunity for social interactions. Based on the evidence, students at [Arbor Bay] eat at their desks, and Student has very limited opportunity to interact with typically developing peers outside the classroom at [Arbor Bay].

AR 190. In support of this conclusion, the ALJ relied on testimony by: 1) Ms. Teach, Ms. English and Ms. Spencer that the moderate SDC at Charlotte Wood would provide Student with mainstreaming opportunities during lunch, recess, PE and other electives; 2) Arbor Bay Director Susan Rose that Student enjoys her friends and is talkative even though she is difficult to understand, and that she participated in the Student Council. *Id*. He discounted Ms. Rose's testimony that Student would not benefit from general PE due to her motor deficit because "her testimony fails to establish that Student would not have received other educational benefits, including social/peer interaction opportunities." *Id*. The ALJ also rejected the testimony of Student's mother that Student would not benefit from mainstreaming, reasoning that: 1) Student's parents had not observed the SDC at Charlotte Wood and therefore the opinion was speculative; 2) the peers that were on Student's softball team and in Girl Scouts are not the same peers she would encounter at Charlotte Wood; and 3) "[t]he evidence fails to establish that Student's conversations with peers cannot be facilitated by District staff in other [sic] to reduce the impact of Student's verbal ineligibility [sic]." AR 191.

Having reviewed the evidence in the record, the Court finds that the preponderance of the evidence supports the conclusion that the mainstreaming in Student's IEP does not provide her with non-academic benefit as required under the IDEA. *See Sacramento City Unified School Dist., Bd. of Educ. v. Rachel H. ,* 14 F.3d 1398, 1404 (9th Cir. 1994). The ALJ -- and the School District in this appeal -- rely heavily on the testimony of Francis English, who is a special education program supervisor for the School District. Ms. English made recommendations for Student's placement at the February 8, 2011 IEP meeting, including the mainstreaming that is part

of Student's IEP.  TR 410.  She testified that in making her recommendation she considered the following factors:

> Well, the factors I looked at were her goals.  I listened to the Arbor Bay staff.  We observed her and spoke with teachers at Arbor Bay. And those were -- when I looked at what she was working on and what she needed to work on, and then also observed her interacting in a classroom, I felt that the moderate class would meet her needs.

> I also believe that a child with her -- with her social ability and her desire to interact with other children, she would -- I believe she requires some sort of interaction with general education students. Not only would she enjoy it, but she would greatly benefit from it, and it would teach her to go beyond being in a self-contained environment with the same students all day.

TR 411.  Ms. English further testified that Student could "definitely benefit from mainstreaming" and that "it's required for students like MM . . .because that is something she would be able to do, and we want to make sure that if the student is able to do that, we provide that opportunity." According to Ms. English, "[t]hat opportunity wasn't available to her at Arbor Bay."  TR 458-459.

With respect to the support Student might receive at Charlotte Wood, Ms. English testified that "[t]here's flexibility because of the number of staff available to assist with the students.  For example, if a student is capable of going to computers, but maybe some of the other students are not, or it's not appropriate for them to go, the teacher has that ability to send a staff person with that child to go to computers if they need support."  TR 407.  She also testified that the social needs of a student are factored into a placement, explaining that:

> If the student has the need for a social skills group, typically that's not done in general ed.  That's not always done in mild classes. That typically is more of a student with moderate social skills, or intensive skills -- intensive needs.  Those are the students who might need explicit instruction in how to socialize.

> We also want students to have enough support, meaning adult support, to go out on the playground, to interact with typically developing peers, to know how to interact in an elective class with support.  So we look at the different needs of the student.

> If the student requires that level of support, the social piece is critical in the development of the child and so we look at that pretty carefully to make sure that whatever class they're placed in, they're

able to have peers, make friends, learn to socialize in different contexts.

TR 409-410.

The Court does not find the ALJ's reliance on Ms. English's testimony persuasive on the question of mainstreaming. While her testimony suggests that one of the SDC staff members *might* be able to assist Student when she is participating in activities and classes with general education peers (e.g., recess, lunch, PE or electives), it is also apparent from her testimony that there is no guarantee of such support on any given day and that the availability of this support would depend on the activities and needs of the other children in the SDC classroom. The absence of any testimony about the degree of support Student would *actually* receive in connection with her participation in mainstream classes and activities is particularly troubling in light of the testimony of Student's mother and the Director of Arbor Bay regarding Student's social needs and abilities.

Student's mother testified that she had placed Student in Girl Scouts during her fifth grade year with general education children from the local elementary school. TR 890. According to her mother, Student's peers refused to socialize with her in Girl Scouts because she had difficulty communicating with the other girls and could not do the same activities. AR 890-891. The other girls "wouldn't communicate with her [and] didn't want to sit next to her. When they were selling Girl Scout cookies, if she was on one side of the grocery store door, the other kids would all be on the other because they didn't want to stand next to her." TR 890. Further, she testified that when the Girl Scout activities were verbal or written, Student couldn't keep up with them. TR 890. And when Student's mother assisted Student with those activities, the other girls still did not socialize with Student but instead socialized with her mother. TR 916. As a result, Student began to complain that she didn't want to go to Girl Scouts or was tired. TR 891. At the end of the year, her parents withdrew Student from Girl Scouts. TR 891.

Student's mother also offered testimony about Student's attempts to participate in softball and soccer teams with general education children. TR 891. Again, the other children ignored Student when she attempted to communicate with them and she had to withdraw from both teams.

United States District Court
Northern District of California

TR 891.  At Arbor Bay, Student socializes with the other children and has friends, her mother testified.  TR 893.

The testimony of Student's mother was supported by the observations of Susan Rose, the Director of Arbor Bay and an occupational therapist.  Ms. Rose testified that Student "has some social pragmatics, some social interaction issues in terms that she doesn't always understand what's going on and frequently her verbal response to that may or may not be on target." TR 824. She testified that at Arbor Bay Student participates in a modified PE program and that her social issues require more assistance than is typically available in a mainstream PE class.  TR 840-841. Further, according to Ms. Rose, Student enjoys the sports and games that Arbor Bay offers with assistance but she would not be able to participate in such activities in a mainstream PE class.  TR 848, 850.   With respect to Student's ability to participate in other non-academic activities, Ms. Rose testified that Student was able to participate in the volunteer student council at Arbor Bay but that this required modifying the pacing of the meeting due to Student's language issues and having someone available who could understand her "and then take her ideas and . . . make them more applicable to the group."  TR 847.

The testimony offered by Student's mother and Ms. Rose contradicts Ms. English's testimony that Student would benefit socially from the opportunity to interact with general education peers.  Even assuming that a staff person were available to assist Student when she was participating in mainstream activities, such as PE, the preponderance of the evidence supports the conclusion that removing Student from an environment in which she is able to socialize with peers, receives sufficient assistance to participate in sports and games and can participate in the Student Council will not be beneficial but rather, is likely to be detrimental to Student's social development.

The ALJ discounted the testimony of Student's mother on the basis that the general education peers at Charlotte Wood are not the same children who Student encountered in Girl Scouts or on the softball or soccer teams. The Court finds this reasoning unpersuasive.  Whether Student will encounter the exact same children at Charlotte Wood is beside the point. The testimony about Student's attempts to participate in Girl Scouts and sports teams with non-

1   disabled peers is probative of her ability to interact socially with general education peers and the

2   likelihood that she will benefit from the mainstreaming in her IEP.  The fact that none of these

3   attempts was successful should be given significant weight in determining whether Student would

4   receive social benefit from mainstreaming.  Further, the testimony of Student's mother is entirely

5   consistent with that of Ms. Rose, the Director of Arbor Bay.  Given that Student's mother and Ms.

6   Rose have observed Student's social abilities on a daily basis over the course of years -- in

7   contrast to Ms. English, who has only observed Student at Arbor Bay on a few occasions -- the

8   Court gives more weight to the testimony of the former witnesses than it does to the latter on the

9   question of whether mainstreaming will result in a social benefit.

10          The Court also finds unpersuasive the ALJ's reliance on the fact that Student's parents had

11   not observed the special day class at Charlotte Wood.  The testimony of Plaintiff's mother relates

12   to Student's ability to socialize during the mainstreamed portion of her day, not while she would

13   have been in the SDC.   Nor is the Court persuaded that Plaintiffs were required to prove a

14   negative -- that is, that the School District could not have provided sufficient assistance with

15   social interactions to mitigate the Student's difficulties socializing with general education peers.

16   As discussed above, testimony offered by the School District that it tries to be sensitive to the

17   social needs of students in the moderate SDC, without any testimony as to the specific assistance

18   Student would receive in this respect, is not sufficient to show that Student would receive a social

19   benefit from mainstreaming in light of the evidence supporting a contrary conclusion.  Therefore,

20   the Court concludes that the mainstreaming in Student's February 8, 2011 IEP deprives her of a

21   FAPE.[9]

---

[9] At oral argument, for the first time, the School District argued that it should be permitted to
"bring in witnesses" to testify about whether mainstreaming would be beneficial to Student.
Given that this question was addressed by numerous witnesses during the administrative
proceeding, and in light of the fact that the School District did not point to any specific issues or
witnesses whose testimony would not be merely cumulative of the testimony that was offered in
the administrative proceeding, the Court exercises its discretion to deny the School District's
request.

United States District Court
Northern District of California

## VI.   CONCLUSION

For the reasons stated above, the Court finds that the School District has failed to offer Student a FAPE under the IDEA.  Accordingly, Plaintiffs' Motion is GRANTED.  Defendant's Motion is DENIED.

IT IS SO ORDERED.


Dated:  April 22, 2013

_____
Joseph C. Spero
United States Magistrate Judge

United States District Court